IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

V.

                                 NO. 98-20154-G/Bre

MARK SARIPKIN,

      Defendant.

---

ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL
AS TO COUNT 1 AND GRANTING DEFENDANT'S MOTION FOR A NEW TRIAL
AS TO COUNT 2

---

Before the court are the motions of defendant Mark Saripkin for judgment of acquittal as to Count 1 of the indictment and for new trial as to Count 2.   Count 1 of the indictment charges Saripkin with conspiring with Billy Talley to corruptly endeavor to obstruct justice, to kill an FBI agent and to kill witnesses in a federal criminal proceeding with intent to prevent their testimony.   After trial, a mistrial was declared as to Count 1 because the jury was unable to agree.   Count 2 charges Saripkin with corruptly endeavoring to obstruct justice and aiding and abetting in that offense.   The jury found Saripkin guilty of that charge.

## I. THE EVIDENCE AT TRIAL

In order to resolve both motions, a detailed examination of the evidence at trial is necessary.   Saripkin was a Memphis lawyer, and Talley was his client.   A few days before the alleged offenses, Talley, a lieutenant employed by the Shelby County

This document entered on the docket sheet in compliance
with Rule 55 and/or 32(b) FRCrP on  1-21-00

Sheriff's Office, had been charged in federal court in this district with altering a vehicle identification number on a stolen vehicle, providing a firearm to a convicted felon, and attempted possession of a controlled substance with intent to distribute.  The charges against Talley were based on information provided by informant Kelvin Marr and confirmed by tape-recorded conversations between Marr and Talley.  The law enforcement official with whom Marr worked in making the tapes was Special Agent Ellis E. Young, Jr., of the FBI.  After Talley's arrest, Talley gave a statement to Young, which, according to Young's testimony, contained admissions.

When Talley made his initial federal court appearance on Thursday, January 25, 1996, Saripkin was present and entered his appearance on Talley's behalf.  Saripkin testified that on that occasion Talley mentioned that his friend "Bear" could help post bond if necessary.  Talley told Saripkin that it was all right to discuss his case with Bear and to tell Bear what he needed. Saripkin recorded this conversation in his file with a notation "OK to talk to Bear about case-cooperate?"  Saripkin said that the notation "cooperate" indicated that he did not exactly understand and questioned to himself how much he could tell someone not a party to the case, but knew that Talley had approved his speaking to Bear.  Talley was ultimately released that day on a signature bond.

A day or so later, Talley contacted Bear, an old, close friend with a long criminal record.  Bear was referred to during

the trial as Ronnie Tyler.[1]  Talley asked Tyler to kill Marr and Young.  Tyler consulted with his wife and an attorney and decided to inform the FBI of Talley's request.  Subsequently, Tyler worked with the FBI in Arkansas, where he lived, and made tapes of phone conversations between Tyler and Talley and Tyler and Saripkin, all between January 28 and February 5, 1996.  The only evidence in the record as to how Tyler happened to call Saripkin comes from the tapes themselves, Tyler's testimony that he contacted Saripkin at the request of the FBI, and Tyler's affirmative response to the government's leading question as to whether Tyler was under the impression that he was to call Saripkin.  The tapes of conversations between Tyler and Saripkin provide the basis for the charges against Saripkin.

## A. CONTENT OF THE TAPES

The tapes in general involve demands by Tyler that Saripkin provide information about Marr and Young to assist in identifying and locating them.  Throughout the phone conversations with Saripkin, Tyler is aggressive and vulgar.  He makes his demands repeatedly and insistently.  He constantly reminds Saripkin that he is dealing with someone who is determined to have his way and that his objective is that Talley not go to prison, whatever the cost.  Tyler never gives Saripkin his name and identifies himself

---

[1] Ronnie Atkins is the true name of the individual whom Talley contacted.  At the time of the contact, Atkins was using the name Ronnie Tyler.  Tyler is the name referred to in the trial exhibits and most of the trial testimony.

only as "Bear." Tyler's testimony is that he was acting at the
direction of the FBI in making his various requests to Saripkin
for information. Saripkin makes statements on the tapes
reasonably interpreted as an agreement to provide information to
Tyler.[2]

The taped conversations are summarized as follows:

1. January 28 Conversation Between Tyler and Talley. Talley
places a collect call from his home to Tyler. Talley is very
concerned about the safety of speaking from that phone, which he
apparently suspects is tapped. Tyler refers to his intention to
call Saripkin around 10:00 that night; he has called earlier and
has learned that Saripkin is out. Tyler arranges to meet Talley
the next day at a Memphis cemetery and says that he will give
Saripkin the exact time and place for Talley to meet Tyler.
Talley asks Tyler to have Saripkin call with the information the
next morning. Tyler asks Talley whether he is certain Saripkin
can be trusted, and Talley responds affirmatively. Tyler then
indicates that he has been trying to reach a father and son who
are well-known criminal defense attorneys in Memphis on Talley's
behalf, but Talley states that he does not want them to represent
him.

2. January 28 Conversation Between Tyler and Saripkin. Tyler
reaches Saripkin shortly after Saripkin has returned from a Super

---

[2] Saripkin did not in fact give Tyler any information on the tapes or
otherwise. Young's full name, which was discussed by Saripkin, appeared on
the criminal complaint filed against Talley and was thus a matter of public
record. Although Young's address and phone number appeared in the Memphis
phone directory, Saripkin did not furnish this information.

Bowl party.  Tyler identifies himself only as "Bear," to which
Saripkin replies, "Yeah, Billy told me."  Tyler begins the
conversation by telling Saripkin that he asked Talley why he did
not use the other attorneys to whom Tyler referred in his earlier
call.

Tyler then asks Saripkin to tell him what the charges against
Talley are, "what them bastards got and what you can do," and "how
much money you need."  Saripkin points out that he has not yet
talked with the prosecutor, Larry Laurenzi, because Laurenzi went
out of town the previous Friday, right after the initial
appearance, and would not be back until the coming Thursday night
or Friday.  Saripkin says that Laurenzi is a good guy, but that
the "feds" will fabricate information if necessary.  Tyler
indicates that he is aware of tapes made by Marr and that he
jumped on Talley for working with Marr.  Saripkin replies that
Marr worked for Talley "for forever" and that Saripkin has
previously represented Marr at Talley's request.  Tyler emphasizes
his close relationship with Talley and says he does not want
Talley in the penitentiary "period."  Saripkin replies that he
does not want Talley to go to prison either.  Then Tyler inquires
whether Saripkin has ever helped Talley in the past.  Saripkin
asks what Tyler means.  Tyler responds "has Billy ever helped
you?"  Saripkin says that Talley stayed in Saripkin's home when
Talley was having marital problems.[3]  Tyler responds that he now

---

[3] The government emphasized that this statement reflected a close
personal relationship between Saripkin and Talley.  Saripkin testified that he
had not seen Talley socially and that this stay occurred when Talley, who was

understands why Talley wants to use Saripkin.  Tyler asks what Talley told Saripkin about him, and Saripkin responds "not much at all."

The two discuss Marr briefly, and then Saripkin outlines the charges against Talley.  Saripkin shares with Tyler some information about the charges provided to him by Talley.  Tyler asks about how much time Talley might have to serve, and Saripkin attempts to answer.

Tyler asks whether Talley gave Saripkin Tyler's phone number. Saripkin says he has the number at his office.  Tyler inquires as to why Saripkin thinks that Talley provided Tyler's phone number to Saripkin.  Saripkin says "he told me that if he needed anything or if money was needed or he needed to get out of jail or we needed anything to call you" and that Talley said "you'd know what to do."  Saripkin indicates that he was told not to give the number to anyone else, and Tyler emphasizes this message.

Tyler advises Saripkin that Talley wants $10,000, a car and "something else" and that Tyler is to tell Saripkin where Talley should meet him.  Tyler says that he already has the cash and begins to explain how it's "gonna work."  At this point Saripkin changes telephones, indicating that he does not trust portable phones.  Tyler cautions Saripkin that since he is Talley's lawyer, "they're gonna be on top of you."  Tyler advises that he has the

---

a deputy in one of the courts, asked Saripkin in court if he had a spare bedroom.  Saripkin indicated he had a room Talley could use.  Saripkin gave Talley a key, and Talley moved himself and some of his possessions into Saripkin's home for ten days to two weeks.

cash and a gun, to be put in a briefcase for which only Tyler, Talley and Tyler's wife know the combination. Tyler relates that he is working on getting a car for Talley, but it has to be "clean," with tags, papers and insurance.

Tyler asks Saripkin if he can beat the case, saying "are you that good?" Saripkin replies, "We can beat any case so long as I got to know what the evidence is." Tyler asks Saripkin how much it will take to get Talley "completely out of it." Saripkin says he prefers to answer when he knows what kind of evidence they have. Tyler presses for an answer and then supplies a suggested range himself of $40,000-50,000. Saripkin says it would be "no more than that" and again indicates that he needs to know what the case against Talley is. He says he needs to talk to Talley and find out what Talley said when questioned.

Late in the conversation, Tyler asks who the "head fed" is and Saripkin supplies Young's name. Tyler apparently already knows this because he supplies Young's nickname of "Eddie." Tyler assures Saripkin that he will only ask for things Saripkin can produce and that he will not ask him to do anything unethical. Saripkin mentions that Talley is not supposed to have weapons, and Tyler responds that Saripkin is not the one getting the briefcase. Finally, at the very end of the call, Tyler requests a recent photo of Marr, a rap sheet and information about Marr's current residence. He also asks Saripkin to find out all he can about Young, including obtaining an address and photo. Tyler indicates he will pay Saripkin extra for that.

7

3. <u>January 29 Conversation Between Tyler and Saripkin</u>.   Tyler calls Saripkin at his office.   Saripkin relays that he has spoken with Talley.   Tyler indicates he is in Memphis trying to get the car for Talley.

Saripkin reports that he has just gotten back "from the feds" where he has been trying to check on a vehicle and money taken from Talley.   He says that Young is not around, but that he has tried to get information on him.   He has not obtained a picture of Young, but has a photo of Marr.   He has been unable to obtain Marr's criminal record and birth date due to computer problems, but promises to have those tomorrow.   Saripkin says he does not believe he will ever be able to obtain a picture of Young.

Tyler again mentions the fee discussed the evening before and reiterates that Saripkin cannot let Talley be returned to jail and in vulgar and racist language essentially says that Saripkin should do whatever it takes to avoid that.   Tyler then says,

> All right, now this is what I want you to do.  You get me every fuckin' thing you can on this fuckin' Eddie Young and I know you can do it so produce.  Now you talking 40 or 50 thousand dollars, get up off your ass and go to work, make this money."

Saripkin says he will do what he can.

Tyler asks Saripkin if he can "squash the deal on the tapes" if Tyler "can get Kevin out of the picture."   Saripkin replies that he will not be able to listen to the tapes until Laurenzi returns.   Tyler then reiterates several times the need for Saripkin to get the requested information and in vulgar language delivers what may quite plausibly be considered a veiled threat to

Saripkin.   Tyler instructs Saripkin to let Talley know that Tyler
will call Saripkin the following afternoon.

Then Tyler says, "As long as we can keep Eddie Young and
Kelvin Marr out of this fuckin' picture, can you squash everything
else?"  Saripkin replies, "I shouldn't have any problem."  Tyler
again reiterates that he does not want Talley to go to jail and
again instructs Saripkin to get the information.  Saripkin
replies, "I'm gonna get everything I can."

4. January 30 Conversation Between Tyler and Saripkin.
Saripkin volunteers that he has Marr's rap sheet, which includes
his last known address.  He says he has a friend working on what
vehicle Marr is driving.

Saripkin has talked to Talley and says that Talley does not
want to be contacted at home, but that he needs the funds.  Talley
feels he is being followed.  There is some discussion about
exchanging the funds at Saripkin's office with Tyler also hiring
Saripkin as his attorney in an effort to make the entire
discussion and transaction privileged.

In response to Tyler's query, Saripkin reports no success in
getting information about Young and indicates he is trying to hire
someone to help with that.  Tyler then goes into a series of
questions about whether the conversation is being taped, what
Talley has told Saripkin about him and whether Saripkin would
"roll" on a client.  Tyler instructs Saripkin to have someone pull
Young's photo driver's license.  When Saripkin indicates he does
not yet have an address for Young, Tyler says "time is money" and

promises to pay Saripkin $50,000 "up front." Tyler again emphasizes the need to obtain the information about Young and indicates he doesn't want any mistakes so that he "hit[s]" Young's neighbor instead of him. Tyler suggests that Saripkin deny ever talking to him if Tyler is ever searched and found with Saripkin's phone numbers. The two arrange a way for Talley to call Tyler from a pay phone.

5. January 30 Conversation Between Tyler and Talley. Talley contacts Tyler. Again the two discuss why Talley is using Saripkin as his lawyer. Talley assures Tyler that Saripkin can be trusted and provides other justifications for using him. Then he indicates that he will fire Saripkin if he cannot handle the discovery. Tyler suggests that in that case, he should not give Saripkin $50,000, and Talley agrees. At several points in the call, they discuss paying Saripkin something at this point.

Talley provides fairly detailed information to Tyler about the location of Marr's mother's home and the various motels in which law enforcement officials have been keeping Marr. The two reminisce about old times and their friendship, and Tyler indicates he wants to be sure Saripkin understands with whom he's dealing. Tyler reports on the information Saripkin has obtained about Marr and asks whether it's better to "do" Marr at the address on his rap sheets. Talley says Tyler should not be telling Saripkin things like that. Tyler asks whether Talley can still take care of something they discussed (apparently a criminal act, most likely a murder) before Talley's arrest, and the two

10

discuss that.

Talley again cautions Tyler about being explicit with
Saripkin.  The two discuss getting in touch through Saripkin the
next day, and Talley suggests that it is not a good idea for
Saripkin to have that information.  He describes Saripkin as a
"perfect patsy."

6. January 31 Conversation Between Tyler and Saripkin.  Tyler
calls Saripkin at his office.  There has been an ice storm, and
Saripkin has arrived downtown to find the courts closed.  Tyler
indicates that he has the money, but is afraid to drive with it in
the ice.  They agree to see what the weather is like later in the
week.  Tyler asks Saripkin to call Talley about that.

In response to Tyler's question, Saripkin says he has gotten
someone to do undercover work.  The person was to start the work
today, but Saripkin doubts he has done anything because of the
ice.  Saripkin gives Young's full name to Tyler.  Tyler asks if
Saripkin has told Talley "what we're gonna do."  Saripkin replies,
"I don't know what you're gonna do."

7. February 1 Conversation Between Tyler and Saripkin.  Tyler
calls Saripkin.  The weather is terrible with four to six inches
of snow predicted.  Saripkin's hired person still has obtained no
information, and Saripkin reports that he says Young has nothing
in his name.  Saripkin says he will continue to seek information
and that they will get all they can.

8. February 1 Conversation Between Tyler and Saripkin.  Tyler
calls Saripkin and gives him a number at which he can be reached

later.  He asks Saripkin to call him there.

9. <u>February 5 Conversation Between Tyler and Saripkin</u>.  Tyler
calls Saripkin.  The weather has meant that nothing was open the
previous Friday.  Saripkin indicates that his source is still
trying to get information on Young and that he still has the
information on Marr.  Saripkin reports meeting with Laurenzi who
will provide transcripts of the Marr tapes and other discovery.
Tyler mentions his upcoming trip to Memphis to obtain money and
"get that."

B. OTHER EVIDENCE

Other than the tapes, the key evidence at trial consists
largely of proof concerning other actions by Saripkin during the
time period when he was receiving the calls.  Saripkin testified
that his primary impression after the January 28 phone call was
that Bear was weird and sounded like a character in a spy novel.
He attached no credibility to the mention that Tyler would pay him
$40,000-$50,000 and indicated that at that point he had not
discussed a fee with Talley.  With regard to the request for
information, Saripkin indicated he did not know the purpose for
which Tyler wanted the information and thought that the request
was strange.  Saripkin indicated that he did not intend to speak
with Bear again after this call.

Saripkin's normal day included many court appearances on
behalf of criminal defendants, and he typically returned to the
office in the afternoon.  When he returned to the office on the

12

afternoon of Monday, January 29, he had multiple messages from
Bear.  Saripkin's secretary, Ramona Benefiel, took these messages
and made notes on the message slips about their content.  For
January 29, these included the following three messages: (1) 9:13
a.m. "To Mark from Bear.  Was very rude and upset because you were
already gone to court and would not leave a number." (2) 1:12 p.m.
"To Mark from Bear.  He called again demanding to know when you
would be back from court.  Is this guy okay?" (3) Between 2:58 and
3:45 p.m. "To Mark from Bear.  I told him you were in a conference
call, that he could hold if he would like, but he became very rude
and ranting on. Nuts, huh?"

     Saripkin did not return the calls, but Bear eventually
reached him in the late afternoon.  During that conversation,
Benefiel entered Saripkin's office.[4]  Saripkin had Tyler on the
speaker phone, as was his habit.  Benefiel heard Tyler mention
$50,000.  Benefiel, knowing this was an outrageous amount of money
and an extraordinarily large fee for Saripkin, looked at Saripkin,
who rolled his eyes at her.

     The January 29 conversation scared and bothered Saripkin.
After its conclusion, Saripkin immediately wrote Talley the
following letter:

     Dear Billy:

          Since you will not talk on the phone with me about your
     case, please call my office and set up an appointment so that
     we can discuss the facts before I talk with the attorney
     general.  I don't want to go in without knowing something

---

     [4] Benefiel could not remember the date on which she overheard the
conversation, but did recall its content.

about the facts other than that Marr is a thief and a liar.

Your friend from Arkansas has called me several times. I know you told me it was O.K. to talk to him but, he is very strange and wants a lot of information that I don't believe he should have and I can't get or give to him anyway.  I feel we need to talk about this, its very important.  He even offered to pay me lots of money to represent you and you know that is not necessary because we have been friends too long.

Please contact Mona as soon as possible and set up your appointment, any afternoon is fine.[5]

                              Very truly yours,
                              LAW OFFICES OF MARK A. SARIPKIN


                              BY: _____
                                  Mark A. Saripkin


Saripkin's handwritten rough draft of the letter and a copy of the typed version are included in Saripkin's office file. Benefiel, who typed the letter, corroborated his testimony about the timing of the letter and its sending.  Moreover, the computer on which it was typed automatically dates such letters from a macro and shows the time of its preparation as 4:47 p.m. on January 29.  The letter was addressed to 201 Poplar, the address of the Criminal Justice Complex, which was Talley's work address prior to his suspension the previous week upon his arrest. Saripkin knew of the suspension.  The government suggests that the letter was merely a device utilized by Saripkin to protect himself.  As evidence of this, it cites the fact that it was sent to a general address for a facility in which many people work and

---

[5] Talley did not schedule an appointment during the time period relevant to this case.  The proof was that he was scheduled to come to Saripkin's office on February 8.

which includes the Shelby County Jail at a time when Talley was no longer employed there.  The 201 Poplar address was the only one in Saripkin's file on the case, however, and Benefiel inserted the address from the file's client data sheet on the typed draft.  It is not included in Saripkin's handwritten version of the letter. Saripkin testified that he did not have Talley's home address.

Later that same day, Saripkin spoke with Lloyd Anthony Deal, a lawyer from whom Saripkin leased his office space.  Both Saripkin and Deal testified that on January 29, Saripkin approached Deal in the law offices after office hours to discuss the situation with Tyler.  Although Deal's area of specialty was civil work, he had been practicing law for 28 years and Saripkin sought his advice.[6]  Saripkin expressed his concern about the calls, which he described as threatening toward other people. Deal indicated that Saripkin was disturbed and upset and concerned as to whether or not the individual calling him was believable. Beyond that, a key issue for Saripkin was his representation of Talley and his concern about breach of confidentiality with his client and his reluctance to take action that might jeopardize Talley's rights.  As Saripkin testified, he did not know whether Talley was talking to Tyler and "whether he was doing something with this guy."  Saripkin recognized that if he reported Bear's phone calls to the authorities, he might get Talley in trouble.

The conversation between Deal and Saripkin ended with the

---

[6] Saripkin himself was not an inexperienced practitioner; he had practiced law for nearly 17 years in January 1996.

conclusion on the part of Saripkin and Deal that Saripkin should contact Larry Laurenzi about the calls.  Deal testified that he advised Saripkin to appease the caller and not do anything to make him more threatening until Saripkin made his contact with Laurenzi.  Deal also advised Saripkin not to give the caller any information.

Later in the week Deal asked Saripkin if he had talked to Laurenzi.  Saripkin responded that Laurenzi was out of town, but that he had left a message for him and would probably see him the following week.

At the time of the conversation with Deal, Saripkin knew that Laurenzi was probably out of town because Laurenzi had told him of his plans.  Nevertheless, he was uncertain as to whether Laurenzi had actually left.  In any event, just after talking with Deal, Saripkin wrote a note to his secretary which said, "Mona, call AG Larry Laurenzi at feds.  Make appointment concerning the Arkansas nut in Talley's case."  Saripkin testified that he adopted the word "nut" from one of Mona's messages to him about Tyler earlier in the day.

On Tuesday, January 30, Saripkin again followed his usual routine with morning court appearances.  His schedule for that day's court appearances includes a handwritten reminder from Saripkin to himself to ask Mona about the appointment.  It says, "Mona, call Larry L about Talley and Bear appointment."

When Saripkin returned to the office on the afternoon of January 30, he had several messages.  Two notes indicated that

16

Mona had tried to reach Laurenzi, but that he was not in.
Messages taken by Benefiel from Bear on that date included: (1)
11:35 a.m. "To Mark from Bear.  The nut.  He was rude to the
machine. Wonder what he thought the machine could do for him." (2)
No time listed. "To Mark from Bear. He demanded for me to find out
from you if you were going to give him any information that he
wants.  I know we're not going to do anything for him on this
case.  This guy is really nuts.  I tried calling Larry L again,
but not in yet.  Please advise." (3) 4:20 p.m. "To Mark from Mona.
Bear called several other times today.  Should I try again
tomorrow for an appointment? Please advise."

   Also on January 30, Saripkin received the third call from
Tyler.  Saripkin testified that the call was scary and threatening
and that Tyler was pushy.  Saripkin said that he placated Tyler by
statements about his efforts to get information, in accord with
Deal's advice.  Saripkin indicated, however, that he never
intended to give Tyler any information.  During the course of this
conversation Saripkin puts Tyler on hold and calls Talley to let
him know that Tyler wants to speak with Talley.  Saripkin gives
Talley a number at which to call Tyler.  Saripkin also told Talley
that he and Talley needed to talk.  Talley responded that he could
not talk on that phone.  Saripkin said he also reminded Talley to
make an appointment, and Talley said he would take care of it.

   Late on January 30 after Benefiel had gone for the day,
Saripkin left her the following note, "Mona, sorry I keep
forgetting things.  I think it is the medicine.  Please remind me

tomorrow to get a subpoena for the trial upcoming, file suppression motion and call Dr. L about medicine.  Call AG Larry about the Arkansas nut.  Thanks, Mark."

On Wednesday, January 31, a day the courts were closed due to weather, Saripkin made a note to himself to call Laurenzi about "Talley and nut."  He in fact made the call personally and noted it "done" on his note.  Saripkin testified that when he called for Laurenzi, he was told that Laurenzi was not in and that he would be back Thursday or Thursday night.  Saripkin talked with Tyler again that day and was glad that Tyler could not come to Memphis due to weather and that Saripkin had the weather as an excuse as well.  He continued to placate Tyler and told him he was attempting to gather the information.[7]  A 5:00 p.m. message to Saripkin from Benefiel notes, "To Mark from Bear.  He called several times earlier today.  I think this guy is on something.  Just thought you would like to know."

Tyler called again on Thursday, February 1, and Benefiel left Saripkin a note about that.  Taken at 9:55 a.m., it said, "To Mark from Bear.  Our friend the nut is still calling.  He's very rude and he's demanding to still talk to you.  Is this guy okay?  He seems to me he's nuts."  A later message from Benefiel to Saripkin at 4:00 p.m. that day said, "To Mark from Mona. Bear called again today, and remember don't forget to keep calling Larry L.  Your

---

[7] Saripkin testified that all his assertions to Tyler that he was trying to obtain information were untrue.  There is no evidence other than these assertions that Saripkin made any effort to obtain information about Young or Marr.

memory, remember."  Benefiel testified that Saripkin normally had an excellent memory, but was taking medicine at this time and was forgetting to do things and return calls.  In the late afternoon Tyler left a number at which Saripkin was to call him, and Saripkin called him back at that number.

On the morning of Friday, February 2, the day when Laurenzi was expected back in the office, Saripkin called for Laurenzi.  He was not in and Saripkin left a voice mail message for him.  It did not go into detail, but said it was important that Saripkin talk with Laurenzi about Talley and the witnesses in the case.  Again, Saripkin made a written reminder to himself to call Laurenzi and noted it "done" on his office records.  Laurenzi was not in the office and did not return the call on Friday.

Young testified that he received a voice mail message from Saripkin on February 2.  According to Young, Saripkin did not indicate any urgency in his message and simply stated his name and that he represented Talley and left his office number for Young to return the call.  Saripkin was not in the office when Young returned the call in the very late afternoon on that date.  Young testified that he left his numbers, including his pager, for Saripkin.  Later he indicated that he did not know whether he spoke to a person or an answering machine when he called for Saripkin.  Young did not hear from Saripkin again.

Young had been aware that Talley wanted to have him killed since January 27, when Young was contacted by his boss while on a hunting trip out of state.  He testified that he did not know the

19

purpose of Saripkin's call and did not know whether it related to that threat.[8]

On Monday, February 5, Laurenzi listened to the voice mail message from the previous Friday. Although recollections differ as to who called whom, Saripkin finally talked to Laurenzi on that date, first by phone and then in a face-to-face meeting. Saripkin reported to Laurenzi that he had been getting phone calls about the witnesses and there were some threats and that he needed to tell Laurenzi about them. Laurenzi responded that Saripkin needed to talk to FBI agents instead and called agents later that day to ask them to meet with Saripkin on February 6. Saripkin spoke to Tyler again on February 5. Benefiel's note to Saripkin on that date about Bear's call, made at 9:05 a.m., reads, "To Mark from Bear. Still calling. He must really like us. However, I still think he's nuts."

On Tuesday, February 6, Saripkin's office received a phone call from the FBI in the early afternoon, and Special Agents John Canale and Steven Anthony were waiting in his office when he returned from court later in the afternoon. The agents interviewed Saripkin at that time. Although the agents were aware of the tapes of conversations between Tyler and Saripkin, other than the February 5 tape, and Canale had listened to them, the agents did not advise Saripkin of the existence of the tapes.

During the interview with FBI agents, Saripkin expressed

---

[8] Tyler was making his tapes under the direction of Arkansas FBI agents, and it is unclear whether Young knew anything at this point about Tyler's conversations with Saripkin.

concern about a call from Bear which he thought had occurred on January 29 and told agents that Tyler had asked for information about Marr, including his rap sheet. Saripkin indicated that Bear was aware that Marr was the informant against Talley. Saripkin told agents that he told Bear that he, Saripkin, would have access to rap sheets and that kind of information about Marr. Saripkin reported that Bear asked what happens if an informant is not around to testify and that Saripkin told him that it is difficult to prove a case without the informant and that the government would have problems without the informant. Saripkin also reported to agents that Bear indicated awareness that Young was the agent who investigated Talley and asked Saripkin for further identifying information about Young. Saripkin told agents that he supplied Young's first name. Saripkin also revealed that Bear asked for additional information about Young, including where he worked and where he lived, but Saripkin did not supply Bear with any specific information, telling him that it would not be difficult to figure out where he worked. Saripkin reported that, when Bear asked what happens if the agent cannot testify, Saripkin told him it would be more difficult, but there were lots of agents who could replace Young. Saripkin related to agents that Bear said he would take care of everything with one quick trip into Memphis and out. Saripkin also indicated that Bear said if Talley does jail time, he would take care of things, which Saripkin interpreted to include possible harm to himself. Saripkin told agents he did not recall any direct threats to kill anyone. In addition to the

21

information about the call, Saripkin told agents about his meeting with Deal and the decision to contact Laurenzi.

On Wednesday, February 7, a meeting was held at the United States Attorney's Office for the purpose of notifying Saripkin of additional charges against Talley based on the tapes and that he had been recorded on some of the tapes. This was the first occasion on which Saripkin was aware that he had been taped. As the meeting was breaking up, Saripkin asked Assistant United States Attorney Fred Godwin, in the presence of Assistant United States Attorney Vivian Donelson, whether he was in any trouble. Donelson could not recall the exact question, but understood the gist of it to be whether Saripkin had any criminal exposure. Godwin responded by asking Saripkin whether he had agreed to do anything. Saripkin said he had not. Saripkin recalled Godwin's question as being whether he had ever done anything for Bear, to which Saripkin replied that he had not.

The defense offered extensive and extremely favorable character evidence on behalf of Saripkin. Character witnesses who testified about Saripkin's character for truthfulness and peacefulness included Tennessee criminal court judges James C. Beasley, Leonard T. Lafferty and Fred Axley, former Shelby County District Attorney John Pierotti, Shelby County Public Defender A C Wharton, former assistant district attorney Michael Hughes and Deal. All of these witnesses knew Saripkin well and had extensive professional contact with him over a period of many years. They were able to give their personal opinions about Saripkin's

22

character as well as proof of his reputation in the community.

## II. JUDGMENT OF ACQUITTAL AS TO COUNT 1

The motion for judgment of acquittal as to Count 1 argues that the evidence was insufficient as a matter of law to permit a jury finding of an agreement between Talley and Saripkin to accomplish any of the objectives listed in the indictment as purposes of the conspiracy.[9]  After careful scrutiny of the record in this case, the court agrees.

The parties agree that any agreement between Tyler and Saripkin cannot constitute a conspiracy because Tyler was acting as a government informant.  The only person with whom Saripkin could arguably have conspired is Talley, as alleged in the indictment.[10]

The parties also agree that there is no evidence of an agreement between Talley and Saripkin to accomplish any of the alleged objectives that derives from any direct contact between the two of them.  Any evidence of an agreement between Talley and Saripkin must be found in the contacts that Talley and Saripkin had separately with Tyler, who, in the government's view, provided

---

[9] The objectives alleged are corruptly endeavoring to obstruct justice, killing an FBI agent and killing witnesses to prevent their testimony.

[10] The government suggested briefly at trial that the unidentified person to whom Saripkin referred in the tapes as helping him obtain information could be considered a coconspirator with Saripkin.  There is no evidence of the existence of this person or any conduct by him other than the imprecise references by Saripkin.  The jury could not have found beyond a reasonable doubt that an agreement existed between Saripkin and this individual.

a link between them.

Examining the evidence with this in mind, the court first reviews the evidence from Talley's perspective. It is undisputed that Talley told Saripkin that Bear could help post bond and that Saripkin could speak to Bear about Talley's case. It is also undisputed that Talley used Saripkin as a link between himself and Bear in making arrangements for Talley and Bear to meet for the delivery of money, a car and a gun. The government does not suggest, and the proof does not support a finding, that this delivery was a part of the conspiracy; that is, there is no evidence that the money, car or gun were to be used in killing witnesses or escaping from their murder. Thus, there is clear proof that Talley intended that Saripkin and Tyler communicate on Talley's behalf for certain purposes.

The evidence is far less compelling that Talley sought to involve Saripkin in a plot to kill witnesses. Tyler offered no testimony that Talley asked Tyler to involve Saripkin in this endeavor. Rather, the FBI's request and an impression from an unidentified source[11] that he was to call Saripkin prompted Tyler to request information about witnesses from Saripkin. By the January 30 conversation with Tyler, Talley clearly was aware that Tyler had sought information from Saripkin, because Tyler advises Talley of this several times. Yet, Talley's comments also suggest that Talley does not want Saripkin to know the purposes for which

---

[11] The record does not indicate whether Tyler received this impression from the FBI or Talley. Given his more specific testimony about the FBI's request, the FBI is at least as likely a source as Talley.

the information was sought.  In the same January 30 conversation, Talley advises Tyler that Saripkin doesn't understand "who you are," tells him not to discuss issues pertaining to doing away with witnesses with Saripkin and calls Saripkin the "perfect patsy."  Based on the January 30 conversation and the other evidence of Talley's intention for Tyler and Saripkin to communicate, the jury could have found that Talley sought to involve Saripkin, to some degree at least, in the plot to kill witnesses.  The evidence would also plausibly support a contrary conclusion.

Talley's intentions are not the determinative issue with respect to the motion, however.  Saripkin's awareness of Talley's involvement is the critical point.  Turning to the evidence relating to Saripkin's perspective, Tyler never tells Saripkin that Talley is involved in a plot to kill witnesses or that he is acting at Talley's direction in seeking information from Saripkin. The evidence is that Tyler was seeking to eliminate witnesses for the benefit of Talley, but there is no evidence that Saripkin had knowledge as to whether Tyler was acting by himself or at the request of Talley.

In response to the motion, the government assumes that evidence that Saripkin and Talley, as lawyer and client, worked together for some purposes constitutes proof sufficient to find beyond a reasonable doubt that they also agreed to kill witnesses. The key bit of proof of this type cited by the government is the following exchange between Saripkin and Tyler from the tape of

their January 30 conversation:

> TYLER: Now, we, we all three.  I'm talking you, me and Billy.
>
> SARIPKIN: Uh huh.
>
> TYLER: Know what we're up to. Correct?
>
> SARIPKIN: Uh, I tend to understand it, yes.

This exchange follows discussions about whether Saripkin would ever "roll" on a client and directions to get Young's photo driver's license, but is immediately preceded by discussion of the fee Saripkin is to receive for representing Talley.  The inference that Saripkin believes that Tyler is referring to a plot to kill witnesses is hardly more plausible than an inference that he is referring to an overall effort to defend Talley or to the planned delivery to Talley of a car, gun and money.  Even more questionable is whether this fleeting reference to Talley by Tyler is evidence from which the jury could find beyond a reasonable doubt that Saripkin knowingly agreed with Talley to kill witnesses.

The legal standard guiding the court's consideration of the issue raised by the motion is articulated in <u>United States v. Rogers</u>, 118 F.3d 466 (6th Cir. 1997).  The court in <u>Rogers</u> discusses the requirement that the defendant know that participants other than a government agent were involved and cites with approval <u>United States v. Fincher</u>, 723 F.2d 862 (11th Cir. 1984).  In <u>Fincher</u>, the court noted that it was "obvious and known" to the defendant that participants other than the government agent were necessary to the criminal enterprise. 723

F.2d at 863.  Here, it was not obvious and known to Saripkin that
any participant other than Tyler was necessary to a plot to kill
witnesses.

The government notes that the court has previously denied the
instant motion at the close of the government's proof and at the
close of all the proof.  While certainly this is correct, the
court did not have the benefit of a close examination of the
transcript during the trial.  Moreover, at trial, the precise
language about the participation of one other than the government
informant being "obvious and known" was included only in a
supplemental jury instruction, given with agreement of the parties
after discussion with counsel of the <u>Rogers</u> and <u>Fincher</u> cases.  A
fair characterization is that the full dimension of this issue
evolved during the case and was fully understood by the court and
probably counsel only after the jury undertook its deliberations.

The evidence that Saripkin agreed with Talley to commit any
of the alleged objects of the conspiracy is insufficient to permit
a conviction on Count 1.  In particular, the court cannot find
that the jury could have found such an agreement beyond a
reasonable doubt and cannot find that the jury could have found
beyond a reasonable doubt that Saripkin was aware of Talley's
participation or that Talley's participation was obvious and known
to Saripkin.  Certainly, Saripkin knew of the possibility or even
the probability of Talley's participation, but this awareness
cannot support the required finding beyond a reasonable doubt.

## III.  NEW TRIAL AS TO COUNT 2

Defendant's motion for new trial argues that the evidence as to Saripkin's state of mind preponderates heavily against the jury verdict of guilty.

Under Rule 33 of the Federal Rules of Criminal Procedure, the court may grant a new trial "if the interests of justice so require."  A district court has wide discretion in deciding whether the interests of justice mandate a new trial.  See United States v. Offutt, 736 F.2d 1199, 1202 (8th Cir. 1984).  If a district court concludes that "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict."  United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980).  The court may weigh the evidence and evaluate the credibility of the witnesses.  See Tibbs v. Florida, 457 U.S. 31, 38 n.11 (1982).  It does not view the evidence in the light most favorable to the government.  See Lincoln, 630 F.2d at 1319.

In United States v. Ashworth, 836 F.2d 260, 266 (6th Cir. 1988) (quoting United States v. Turner, 490 F. Supp. 583, 593 (E.D. Mich. 1979)), the Sixth Circuit Court of Appeals endorsed the appropriate standard as follows:

> [T]he trial judge can consider the credibility of
> the witnesses and the weight of the evidence to
> insure that there is not a miscarriage of justice.
> It has often been said that he/she sits as a
> thirteenth juror.
>     Nevertheless, granting a Fed.R.Crim.P. 33
> Motion for New Trial attacking the weight of the
> evidence is a discretionary matter.  The Court
> should exercise such discretion only in the
> extraordinary circumstances where the evidence

preponderates heavily against the verdict.

In order to evaluate the evidence under this standard, it is necessary to examine the intent requirements for the offense charged in Count 2.  That count alleges a violation of 18 U.S.C. § 1503 and aiding and abetting in that offense in violation of 18 U.S.C. § 2.  Section 1503 defines as a criminal offense the act of corruptly endeavoring to influence, obstruct or impede the due administration of justice.  As described in the court's instructions to the jury in this case,

> To act corruptly as that word is used in these instructions means to act voluntarily and deliberately and for the purpose of improperly influencing or obstructing or interfering with the administration of justice. ... The term 'endeavors' as used in these instructions means to knowingly and deliberately act or to knowingly and deliberately make any effort which has a reasonable tendency to bring about the desired result.

Initially, the court notes that the odd manner in which this offense is charged contributes to the difficulty of the analysis. The act alleged in the indictment to constitute this offense is the statement by Saripkin to Tyler in their January 29 conversation that he "shouldn't have any problem" preventing the introduction of other evidence.  This entire response is based on the hypothetical question posed by Tyler immediately preceding it, "As long as we can keep Eddie Young and Kelvin Marr out of this fuckin' picture, can you squash everything else?"  If Saripkin is considered a principal, this statement in and of itself is hardly an endeavor to obstruct justice, corruptly or otherwise.  It is simply a statement of Saripkin's opinion of legal reality if the

29

facts assumed in the hypothetical occurred.[12]  For this reason, the court has assumed throughout that the government intended to proceed on an aiding and abetting theory, an assumption confirmed by the government at trial and in response to the instant motion. Under this theory, the statement could reflect Saripkin's intent to participate in obstruction of justice by assisting with the elimination of witnesses or, as the government suggests, his intent to counsel and induce obstruction of justice by giving an opinion as to the legal effect of eliminating witnesses.

Whatever the theory, the critical issue raised by the motion is Saripkin's intent, that is, whether he acted with the deliberate purpose of attempting to obstruct or impede justice. The evidence supporting the government's position on this issue is found in the tapes themselves.  Saripkin makes statements on the tapes from which a reasonable juror could find that he was attempting to procure information which he knew would be used to eliminate witnesses and that he was a participant in and supporter of the plan to do so.

The evidence contrary to the government's position consists largely, but not exclusively, of Saripkin's other actions during the time he was talking to Tyler.  The typical individual seeking to obstruct justice would attempt to keep his efforts secret. Saripkin, by contrast, let a number of people, including Deal,

---

[12] The indictment could have charged the offense more broadly by referring to Saripkin's overall course of conduct or narrowly by referring to one or more statements to the effect that Saripkin was attempting to procure the requested information.  The statement selected is a much less obvious effort to obstruct justice than either of these alternate approaches.

Benefiel, Laurenzi and the FBI, know about his conversations with Tyler at a time when he was unaware that he had been taped.

Saripkin also took immediate steps to communicate with Talley, his client, about the conversations with Tyler. The evidence concerning the January 29 letter clearly establishes that the letter was prepared and sent just after Saripkin's first conversation with Tyler about elimination of witnesses. The government's suggestion that the letter was a "slick trick" is clearly improbable. It is not logical to suppose that, at the same time Saripkin acted with criminal intent in deciding to help eliminate witnesses, he also took steps to make the discovery of his conduct more likely. It is even less logical to suggest that the address on the letter meant that Saripkin did not really want Talley to receive the letter. Even if the letter was insincere and an effort to cover up criminal wrongdoing, Saripkin would have had no reason for preventing Talley's receipt of the letter, which provided as much assistance to Talley as Saripkin, by implying that Talley was unaware of Tyler's actions. The most likely explanation of the letter is that it represented a genuine effort by a lawyer to contact his client and discuss Tyler's behavior with him. In particular, Saripkin had a need to communicate his concern about Tyler's remarks to Talley and a need to ascertain Talley's knowledge of them.[13]

Saripkin also promptly consulted with Deal. While a more

---

[13] The legitimacy of this effort is reinforced by Saripkin's remarks to Talley on January 30 about his need to talk to him and the need for Talley to make an appointment.

prudent course of conduct might have been to consult with an attorney who practiced criminal law and who was sensitive to ethical issues facing criminal practitioners, there was absolutely no reason for Saripkin to consult with any other attorney if he intended to obstruct justice.

Saripkin attempted to contact Laurenzi and Young. To be sure, Saripkin knew that Laurenzi was likely out of town. While Saripkin would have exercised better judgment if he had made more urgent efforts to contact law enforcement officials, the essential point is that he made an effort to do so--an action inherently inconsistent with an intent to obstruct justice.

Moreover, Saripkin had reason to believe that no effort to kill witnesses was imminent. Saripkin's belief was that Tyler was waiting to receive information from Saripkin before taking action. Saripkin was failing to provide information and providing excuses for the delays in doing so. In addition, Tyler was reluctant to travel to Memphis due to the weather. Thus, Saripkin had a reasonable basis for believing that no harm to the witnesses would occur if he did not talk to Laurenzi, Young, or other law enforcement officials immediately.

Finally, Saripkin agreed to be interviewed by the FBI and truthfully provided the basics of Tyler's communications with him. The government focuses on omissions from this account, but a more pertinent point is what it includes. Surely, in hindsight, Saripkin should have been more forthright about his statements to Tyler. Instead, he through omission portrayed his own conduct as

32

more blameless than it in fact was.

Apart from the proof of Saripkin's actions, the tapes themselves give some plausibility to Saripkin's explanation of his decision to pretend to "go along" with Tyler.  Tyler is aggressive, rude and threatening, particularly in the January 29 call immediately preceding the statement by Saripkin alleged by the government to constitute the obstruction of justice.

Two other factors contribute to the credibility of Saripkin's position about his actions.  First, the evidence does not reveal any clear motive for Saripkin's alleged crime.  While Tyler mentioned the possibility of a large fee, the evidence from both Saripkin and Benefiel suggests that Saripkin did not really believe him, and in fact, the tapes show little interest in the fee on Saripkin's part.  Also, Tyler does not explicitly link the fee to providing information.  Second, Saripkin as an attorney faced a very real ethical dilemma.  He did not know whether his client was a part of Tyler's scheme.  If he was, Saripkin could seriously harm his client by divulging Tyler's calls to law enforcement.  Any delay or hesitancy in Saripkin's contacts with law enforcement is plausibly explained by this situation.  In fact, the delay is far more likely to be attributable to the ethical problem than to criminal intent on Saripkin's part.

Finally, the court, properly evaluating the credibility of witnesses, turns to issues of witness credibility.  The court finds that Saripkin was largely a credible witness.  He was not significantly impeached in any respect.  Differences in

33

recollection about what was said or done at various times, including the February 7 meeting, are largely insignificant.

The character witnesses in this case were also credible and more important in the overall case than character witnesses typically are.  Their testimony was significant, not because of the positions they occupy, but because of their opportunity to observe and deal with Saripkin over a long period of time in many, many situations in which his credibility and honesty were always important and at stake.[14]

Assessing all the proof as a whole, the court finds that the evidence heavily preponderates against the jury's verdict on Count 2.  The motion for new trial is granted as to count 2.

IT IS SO ORDERED.


_Julia Smith Gibbons_
JULIA SMITH GIBBONS
UNITED STATES DISTRICT JUDGE


_January 20, 2000_
DATE

---

[14] The government makes a request in its response to the motion that the court "use care in exercising her role as a fact finder when weighing testimony of such witnesses based on her high opinion of them obtained from any personal and professional contact."  The court has never considered a personal or professional relationship with any witness in evaluating the testimony of that witness and will not do so in this case.

34